## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:12-cv-00967-JLK

KENNETH JASON RAGSDELL,

      Plaintiff,

v.

REGIONAL HOUSING ALLIANCE OF LA PLATA COUNTY,
LA PLATA HOMES FUND, INC., and
JENNIFER LOPEZ,

      Defendants.

---

### ORDER GRANTING IN PART AND DENYING IN PART ECF. DOC 34 & GRANTING ECF DOC. 35

Kane, J.

## I.  INTRODUCTION

Before me in this employment discrimination action are two motions for summary judgment: the joint motion of Defendants the RHA and Ms. Lopez at Doc. 34, and Defendant LPHF's separate motion at Doc. 35.  For the following reasons, regarding Doc. 34, I GRANT summary judgment in favor of Defendants Lopez and the RHA on Mr. Ragsdell's Second (Rehabilitation Act) and Fourth (wrongful discharge-constructive discharge) claims and DENY summary judgment for the same on Mr. Ragsdell's First (Equal Protection) and Third (CADA) claims. I further GRANT LPHF's Motion for Summary Judgment, Doc. 35, in full.

## II.  JURISDICTION AND VENUE

This action arises under the Constitution and laws of the United States and is brought per Title 42 U.S.C. § 1983 and the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq*. I have jurisdiction per 28 U.S.C. §§ 1331, 1343 and 1367 and 42 U.S.C. § 1983. Jurisdiction supporting Mr. Ragsdell's claim for attorney fees and costs is conferred by 42 U.S.C. § 1988 and 29 U.S.C. § 794a(b).

The employment practices alleged to be unlawful were committed within the United States District of Colorado. Venue is proper in this Court per 28 U.S.C. § 1391.

### III.    STANDARD OF REVIEW

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Adamson v. Multi Community Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008).  A disputed fact is material if it could affect the outcome of the suit under the governing law.  *Adamson*, 514 F.3d at 1145.  A factual dispute is genuine if a rational jury could find for the nonmoving party on the evidence presented.  *Id.* In deciding whether the moving party has carried its burden, I may not weigh the evidence and must view the evidence and draw all reasonable inferences from it in the light most favorable to the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Adamson*, 514 F.3d at 1145.  Neither unsupported conclusory allegations nor a mere scintilla of evidence in support of the nonmovant's position are sufficient to create a genuine dispute of fact.  *See Mackenzie v. City and County of Denver*, 414 F.3d 1266, 1273 (10th Cir. 2005); *Lawmaster v. Ward*, 125 F.3d 1341, 1347 (10th Cir. 1997).

## IV.    FACTUAL BACKGROUND

Defendant the Regional Housing Alliance of La Plata County (the "RHA") is a small community based housing assistance organization, with four employees during the relevant time period, helping low to middle income individuals and families purchase homes in southwestern Colorado.  The RHA is a governmental entity and operates under a funding agreement between La Plata County, the City of Durango, and the Towns of Ignacio and Bayfield. Defendant La Plata Homes Fund ("LPHF") is a non-governmental, non-profit affordable housing agency also designed to help individuals and families purchase homes in southwestern Colorado.  As a non-profit, LPHF had the ability to borrow money in compliance with TABOR and to apply for major funding sources including the Department of Treasury's program for Community Development Financial Institutions ("CDFI") certification.  It obtained CDFI certification.

LPHF is governed by a voluntary board of directors who meet on a monthly basis. The individuals who make up the LPHF board are entirely separate from those that serve on the RHA Board of Directors.  LPHF has no employees and all of LPHF functions are performed by contractors. Personnel issues were never discussed at LPHF meetings.  In early September 2008, LPHF and the RHA entered into a MasterAgreement for Cooperative Services.  Upon entering into the Master Agreement, the RHA and LPHF agreed that:

> [LPHF] shall not be deemed to be an enterprise of the RHA or a subsidiary entity owned or controlled by the RHA. [LPHF] shall only exercise the authority set forth herein or in a supplementary contract between the parties, and shall not otherwise be deemed to be an agent of the RHA. The parties agree that [LPHF] shall be

> deemed to be an independent organization and that it shall not be subject in any way to the provisions of state law that apply to governmental entities, including the provisions of TABOR.

Exhibit at p. 2, ¶8.  LPHF contracted with the RHA for use of their executive director to provide services specific to grants available and for defined time periods.  At all times material, Jennifer Lopez was Executive Director of the RHA.

In February of 2011, Mr. Ragsdell was hired over other applicants by Ms. Lopez and the RHA's then Deputy Director, Julie Levy, to be a Client Services Advisor.   At the time of his hire, Ms. Lopez and Ms. Levy were both aware that Mr. Ragsdell has multiple sclerosis ("MS"), but neither was concerned this would be an issue or a reason not to hire him. Upon his hire, Mr. Ragsdell acknowledged receipt of the RHA handbook, and further acknowledged that he had the opportunity to review the handbook. After review of the RHA Handbook, Mr. Ragsdell did not have any questions concerning its contents. Before termination of an employment relationship, the RHA Handbook provides several types of discipline including verbal counseling, official written reprimand and suspension.  Mr. Ragsdell further acknowledged that, through the policies of the handbook and his personal understanding, the RHA utilized a system of progressive discipline, reaching termination after prior lesser discipline had been conducted.

From Mr. Ragsdell's hiring through February of 2011, Ms. Levy was Mr. Ragsdell's immediate supervisor.  Part of Mr. Ragsdell's duties as a Client Services Advisor were to maintain client files.  In the fall of 2010, Mr. Ragsdell received a performance evaluation from Ms. Levy after his first six months of probationary employment.  The evaluation was generally positive, but did not result in a pay raise and

indicated Mr. Ragsdell could improve on setting realistic deadlines.  In the beginning of

2011, Ms. Levy announced that she would be leaving the RHA for another job.

Before she left her employment with the RHA, Ms. Levy sought a specific document

from a client file. When both she and Mr. Ragsdell were unable to locate the document in

the file, Ms. Levy became concerned that loans for which Mr. Ragsdell was responsible

were at risk and that the RHA's resources were not protected. Upon realizing the status of

the files, Ms. Levy consulted with Ms. Lopez and voiced her concern that the status of

the files may cause issues with the upcoming audit.  After Ms. Levy announcing she was

leaving, on February 7, 2011, Mr. Ragsdell received his one year performance review

from Ms. Levy. Mr. Ragsdell's capabilities, as rated by Ms. Levy, stayed generally the

same with the exceptions that his product/technical knowledge and time management

scores received one and two point reductions, respectively.  Around the same time as Mr.

Ragsdell's one year performance evaluation,and after Ms. Levy had informed the RHA

that she would be leaving, Mr. Ragsdell informed Ms. Lopez that he had applied for

another job as a radio deejay.

In light of the upcoming departure of Ms. Levy and Mr. Ragsdell's request to take

on more responsibilities, and in an attempt to persuade him from leaving the RHA for

other employment, thereby leaving the RHA with only two employees, Mr. Ragsdell

received a raise and additional responsibilities in February 2011.  At the time of Mr.

Ragsdell's raise in early February 2011, Ms. Lopez was "fairly unaware" of Mr.

Ragsdell's previous performance. Lopez Dep. 158:17-20.  Shortly after Mr. Ragsdell

received his raise, and shortly before Ms. Levy left the RHA, Ms. Levy informed Ms.

Lopez about some issues concerning her regarding Mr. Ragsdell's performance.  After Ms. Levy informed Ms. Lopez about Mr. Ragsdell's various deficiencies, the three met for a short meeting in which the various issues with Mr. Ragsdell's employment were discussed. At the close of the meeting, Ms. Levy compiled a memorandum documenting her concerns that were discussed in the meeting.  Sometime between February 7th and 17th, Mr. Ragsdell informed Ms. Lopez that his medical condition would require him to increase his medical visits to Denver from twice per year to four times per year.  Mr. Ragsdell was never denied leave to go to a medical appointment and attended one of his requisite trips between the time he notified Ms. Lopez of his increased frequency and when he quit.

To prepare the RHA for upcoming federal audits and to provide temporary support to the client services activities because of Ms. Levy's departure, in late January 2011, the RHA hired Marietta Linney as a temporary assistant.  Just after Ms. Linney was hired, on Friday, January 28, 2011, Ms. Lopez directed Mr. Ragsdell to spend the following Tuesday morning with Ms. Linney in an effort to get Mr. Ragdell's files in order.  In preparing for the upcoming audit in 2011, Ms. Linney became concerned about the condition of the files and what had not been done.  In addition to preparing closed files for audit Ms. Linney also assisted Mr. Ragsdell in organizing his other open/intake files.  Ms. Linney recalled that the client intake files were strewn about Mr. Ragsdell's office, "on the floor all over, spread all over. Some on the counter, some on the filing cabinets, kinda everywhere." Linney Dep. 30:1-7; Ex. 81, ¶ 10.  Mr. Ragsdell maintains his files were in disarray because Ms. Lopez had just ordered him to reorganize the files.

Near the approach of the financial audits, Ms. Lopez sent Plaintiff two emails, on March 24 and 25, 2011. In the emails, Ms. Lopez stated:

• "Jason- It would be prudent to tidy your office up for the auditors next week—if you need to come in this weekend to do so I would let you bank the hours-thanks" [Email from Ms. Lopez to Plaintiff regarding office, dated March 24, 2011.].

• Jason—please do as much as you can around audit finalization—if you don't get it all done today would you consider coming in this weekend? [Email chain between Plaintiff and Ms. Lopez regarding FSA Question, dated March 23, 2011.]

Mr. Ragsdell came in over that weekend and did as requested.   In the beginning of March 2011, Mr. Ragsdell took an approved two week vacation to Europe, returning to work on March 15, 2011. On the day following Mr. Ragsdell's return to work, Ms. Lopez sent an email to him noting her concern that his leave accruals were low due to the recent vacation and informing him that he may want to think about banking hours to ensure that he had enough leave time accrued to accommodate his upcoming medical appointments.

In early April 2011, with Pam Moore coming on as Deputy Director, the employees of the RHA discussed switching offices.  In discussing the office moves, Mr. Ragsdell noted that the move to another office would "be better for [him] anyways because it would be cooler." Ragsdell Dep., Vol. I, 166:12-21.  The night before the office move, on March 28, 2011, Ms. Lopez asked Mr. Ragsdell to sign an acknowledgment form concerning Red Flag Rules.  The Red Flag Rules addressed

confidentiality and proper care of personal information to ensure that it was not

inadvertently disclosed to the public.  Mr. Ragsdell testified that he believed Defendant

Lopez asked him to sign so that she could later accuse him of violating the rules.

Ragsdell Dep., Vol. I, 117:3-23.

On a weekend in early April, staff from the RHA, as well as the husbands of two

employees, moved all of the furniture, including filing cabinets, from Mr. Ragsdell's

old office, across the hall to his new office.  During a weekday following the move, Mr.

Ragsdell was sitting in the lobby and asserts that Ms. Lopez asked him, "What are you

doing? Just chillaxin?" and then asked Mr. Ragsdell to assist with the move. Ragsdell

Dep., Vol. I, 22:9-20. Mr. Ragsdell asserted that by assisting in the office move he, "felt

[he] would have just been more in the way than helpful." Ragsdell Dep., Vol. I, 23:3-7.

Mr. Ragsdell states that he requested assistance in moving files from one office to the

other and was denied.  Ragsdell Dep., Vol. I, 167:3-6.  Eventually, with the help of a

rolling chair, Mr. Ragsdell moved all of the files by himself.  On April 5, 2011, about a

week after the move, Ms. Lopez emailed Mr. Ragsdell instructing him on the priorities

for that week. The list included an instruction for him to get his new office settled as soon

as possible.  Mr. Ragsdell perceived this email as harassing, because his medical

condition made settling the new files in his office a burden.  The next week, on April 13,

2011, Ms. Lopez sent Mr. Ragsdell another list denoting the tasks to be addressed that

week. Again, among other items for the week Ms. Lopez instructed Plaintiff to,

"Finish filing and settling into the office, organizing files etc." Exhibits 11 & 47.

The April 13th email also expressed Ms. Lopez's concern over her belief that Mr. Ragsdell had exhausted his available sick leave after he had taken time off for a chest cold.  Mr. Ragsdell cordially responded to the April 13, 2011, clarifying that he had one day of sick leave remaining, one day of vacation, and two days of comp remaining, but that he would be putting extra hours anyway.  Mr. Ragsdell perceived that it was irrational for Ms. Lopez to expressing concern or warning him that he was getting low on leave after he used portions of his leave.  He believed this inquiry was her "umpteenth." Ragsdell Dep., Vol. I, 163:22-164:6,

Nearly a month after the move, Mr. Ragsdell had not by April 25, 2011 arranged his office or properly put the files in their appropriate place.  On the evening of April 25, 2011, a Monday, Ms. Lopez forwarded two memoranda to Mr. Ragsdell, sent him an email and again asked him to acknowledge the Red Flag Rules.  The email ordered Mr. Ragsdell "to have [his] office in immaculate condition with all files properly filed by wed [sic] at 8 am." Exhibit 24; Exhibit 131, Lopez Dep. 53:14-54:1, 54:23-55:1. The email further instructed, "I need to see better performance from you immediately." *Id*.  Ms. Lopez characterizes the memos as addressing ongoing performance issues, while Mr. Ragsdell characterizes them as scrutiny and threats of termination.  At his deposition, Mr. Ragsdell acknowledged that all of the program changes and requests in the Exhibit 1 memo, taken on their own, were not inappropriate instructions.  Ragsdell Dep.,Vol. I, 24:7-29:25.  He further acknowledged that certain job performance issues raised in the Exhibit 2 memo were not unreasonable on their own. *Id*. at 57:4-7.

Mr. Ragsdell argues, however, that though not unreasonable individually, the memoranda are examples of the way he felt he could never keep up with Ms. Lopez's directions. Mr. Ragsdell observed that "[i]t seemed literally nothing was acceptable to Ms. Lopez" and that he was under "nonstop," unwarranted scrutiny from Ms. Lopez. *Id.* at 138:10-14, 142:10-23. After receiving the memoranda, Mr. Ragsdell requested assistance from Ms.Linney to arrange the files in his office. Ms. Linney then assisted him in arranging the files, which took a couple of minutes. On April 26, 2011, Mr. Ragsdell was angry and wanted to speak with Ms. Lopez. As he was coming in, however, she was leaving to go on a field trip with her son and told Mr. Ragsdell he would have to wait until sometime in the afternoon of that day to speak with him. Mr. Ragsdell decided not to wait and instead verbally resigned to Ms. Moore. In resigning, Mr. Ragsdell instructed Ms. Moore and all other RHA employees to never contact him; and that he would not answer any questions, including follow-up questions about processes or client files. When Ms. Moore asked if there were any "fires" (i.e. emergencies) that she should know about, Mr. Ragsdell responded by saying that he was no longer answering questions. Mr. Ragsdell asserts that his rationale for refusing to answer further questions is because further communication would invite accusations of deficiencies and harassment from Ms. Lopez. Before resigning, Mr. Ragsdell did not attempt to levy a discrimination complaint or talk to the RHA board. Nor did he consult the Employment handbook or attempt to determine whether a grievance procedure was available. Mr. Ragsdell did not know that mediation through the EEOC or the CCRD was available and did not seek it. Mr. Ragsdell acknowledges that Ms. Lopez never

yelled at him or called him names, but asserts that she was "always sarcastic."  Ragsdell

Dep., Vol. I, 143:7-10.

## V.     DISCUSSION

### A.  LPHF is not liable because there was no employment relationship between it and Mr. Ragsdell.

Because LPHF never employed Mr. Ragsdell, all claims against LPHF fail

irrespective of what they might offer on their merits.  An employment relationship can be

shown in two ways (1) the joint-employer test, or (2) the integrated enterprise or single

employer test. *See, e.g.*, *Bristol v. Bd. of Cnty. Comm'rs of the Cnty. of Clear Creek*, 312

F.3d 1213, 1218 (10th Cir. 2002).  Here, Mr. Ragsdell cannot establish that LPHF was

his employer under either test.

### i.     LPHF was not Mr. Ragsdell's employer under the joint employer test.

Independent entities may be characterized as joint employers "if the entities share or

co-determine those matters governing the essential terms and conditions of employment."

*Sandoval v. Boulder Reg'l Communs. Ctr.*, 388 F.3d 1312, 1323-24 (10th Cir.

2004)(quoting *Bristol v. Bd. of County Comm'rs of the County of Clear Creek*, 312 F.3d

1213, 1218 (10th Cir. 2002)). "The basis of the [joint employer] finding is simply that

one employer while contracting in good faith with an otherwise independent company,

has retained for itself sufficient control of the terms and conditions of employment of the

employees who are employed by the other employer." *Id*. at 1324 (quoting *Swallows v.

Barnes & Noble Book Stores, Inc*., 128 F.3d 990, 993 n.4 (6th Cir. 1997)). "Most

important to control over the terms and conditions of an employment relationship is the

11

right to terminate it under certain circumstances." *Id.* (quoting *Bristol*, 312 F.3d at 1219). LPHF does not have sufficient control of RHA and its employees to meet this test.

To begin, LPHF itself does not have and never has had employees.  Instead, LPHF's *volunteer* Board of Directors contracts with various entities to provide the necessary services for its operation. This includes contracting with the RHA for definitive periods of time with earmarked funds from specific grants. While LPHF may contract with the RHA for specific services, the RHA is solely responsible for the hiring, firing, promoting, demoting and any other employment decision regarding RHA employees, including Mr. Ragsdell. LPHF's contract with RHA does not provide individuals with any employment benefits or personnel manuals.  LPHF has no policies regulating or fixing the amount of sick or vacation days provided to any of the RHA's employees, and nor is LPHF provided with any information regarding an employee's use of sick or vacation days. Further, LPHF is not consulted when the RHA posts openings for new positions at RHA.

Most importantly to the analysis of a joint employment relationship, LPHF has no authority or decision-making ability regarding the termination of any RHA employee, Mr. Ragsdell included. LPHF does not independently review any of its contractors' performances, relying on the actual employer of a contractor for this function. LPHF has not retained any control over the terms and conditions of any of its contractors' employees, including those employed by RHA.  On this issue, Mr. Ragsdell's case law is inapposite.

For example, the plaintiff in *Zinn v. McKune*, 143 F.3d 1353 (10th Cir. 1998)(plaintiff asserted claims based on Title VII of the 1964 Civil Rights Act and Kansas's common-

law whistleblower retaliatory discharge doctrine for being placed on disability leave without pay), was hired by Prison Health Services ("PHS") as a correctional nurse assigned to work at a prison clinic operated by the Kansas Department of Corrections (the "Department"). *Id*. at 1355. A contract between the Department and PHS expressly provided that both PHS and its employees were independent contractors and explicitly disclaimed the existence of any agency, employment or master-servant relationship between PHS and the Department. *Id*.  The plaintiff's supervisors were, however, all employees of the Department. *Id*.  In determining whether an employment relationship existed between plaintiff and the Department, the Court looked to the factors discussed in *Lambertson v. Utah Dept. of Corrections*, 79 F.3d 1024, 1025  (10th Cir. 1996). First and foremost, the court looked to what extent the Department had the "right to control the 'means and manner' of the worker's performance." In addition, the court considered:

> (1)The kind of occupation at issue, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the employer or the employee furnishes the equipment used and the place of work; (4) the length of time the individual has worked; (5) the method of payment whether by time or by job; (6) the manner in which the work relationship is terminated; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the employer; (9) whether the worker accumulates retirement benefits; (10) whether the employer pays social security taxes; and (11) the intention of the parties.

*Id*. at 1357. The court determined that "PHS provided services to the Department as an independent contractor, and PHS employees, merely by fulfilling terms of the Department-PHS service contract, did not thereby become Department employees. *Id*.

Further, the court stated that "[t]hough the Department retains the right to request removal of PHS personnel with whom it is dissatisfied, and did so in this case, PHS alone exercises control over the hiring and firing of PHS personnel." *Id*.

Factually parallel to *Zinn*, the RHA provides services to LPHF based on a contract, the Master Agreement. The Master Agreement expressly memorializes the RHA's and LPHF's intent to maintain an independent contractor relationship in which LPHF would contract with various entities for the services it needed, including the RHA. An employee of the RHA does not become an employee of LPHF by fulfilling the terms of the contract entered into between the RHA and LPHF. LPHF had none of the requisite control over the means and manner of Mr. Ragsdell's employment. LPHF did not decide when Mr. Ragsdell worked, how much he was compensated, what benefits he received or who he reported to. The RHA paid Mr. Ragsdell a salary, regardless of time spent on LPHF projects. While RHA received some reimbursement for Mr. Ragsdell's time, this reimbursement had nothing to do with calculating Mr. Ragsdell's salary or providing benefits. Moreover, unlike the situation with the putative employer in *Zinn*, LPHF neither requested nor had the authority to request that Mr. Ragsdell be removed from his position.

LPHF simply paid RHA for the services it received pursuant to the Master Agreement. Mr. Ragsdell's argument that such payments support a finding of an employment relationship between LPHF and Mr. Ragsdell was addressed by the court in *Zinn*. The *Zinn* court rejected the position, the Court should do the same here. The *Zinn* court explained that "the Department simply pays for the services provided by PHS

personnel as provided in the contract, and it is PHS' responsibility to pay wages, salaries, and benefits to PHS personnel." *Id*.  Here, LPHF simply paid for the services provided by RHA personnel per the Master Agreement, and it was RHA's responsibility to provide Mr. Ragsdell's wages, salaries, and benefits.

Furthermore, LPHF's inability to control RHA employees is indicated by its Community Development Financial Institutions ("CDFI") certification.  The Department of Treasury operates the Community Development Financial Institutions Fund ("Fund") for the purpose of "promot[ing] economic revitalization and community development through investment in and assistance to [CDFIs]." 12 CFR 1805.100. "Entities seeking [CDFI] certification shall provide the information set forth in the application for certification." 12 CFR 1805.201(a). "Certification by the Fund will verify that the entity meets the CDFI eligibility requirements." *Id*.  Among other things, the entity applying for CDFI certification "shall not be an agency or instrumentality of the United States, or any State or political subdivision thereof." 12 CFR 1805.201(b)(6). "An entity that is created by, or that receives substantial assistance from, one or more government entities may be a CDFI provided it is not controlled by such entities and maintains independent decision-making power over its activities." *Id*.

In 2009, LPHF was certified as a CDFI to provide subordinate mortgage loans for low-income households in La Plata County, Colorado. *See* Awardee Profiles Details from http://www.cdfifund.gov, Exhibit 126. Homes Fund was recertified and received CDFI funding in 2010 and 2012.  Exhibits 127 and 128.  Per the regulations, the Department of has verified, through the issuance of CDFI certification, that LPHF is not an agency or

instrumentality of RHA and that LPHF is not controlled by RHA but maintains independent decision making power over its own activities.  If LPHF was a joint employer with the RHA, it would not have the required independence from governmental entities to obtain CDFI certification.  Mr. Ragsdell does nothing to analyze the corollaries of the CDFI certification, preferring instead to sweep the issue aside in a footnote stating that LPHF "To say the least, overstates the implications to the CDFI program of a ruling recognizing that it was Mr. Ragsdell's employer along with RHA." Doc. 40, p. 26, n. 44. Here, I wish Mr. Ragsdell had said more than "the least" and provided some explanation as to why he believes that LPHF's independent status under the CDFI certification requirements does not vitiate his suggestion that the LPHF is his joint employer along with the RHA.  For all of these reasons, LPHF was not Mr. Ragsdell's joint employer.

> ii.   *LPHF was not Mr. Ragsdell's employer under the integrated enterprise or single employer test.*

As a threshold issue, I note that the parties dispute whether Mr. Ragsdell properly pleaded the integrated enterprise or single employer test such that he may even advance the argument at all.  While Mr. Ragsdell asserts that LPHF has been on notice since Mr. Ragsdell's CCRD filing and since his complaint in this action that he considered LPHF his employer and that I may consider all facts developed through discovery, LPHF astutely points out that Mr. Ragsdell's filings have referenced his employment theory only as one based on joint employment.  The theory is found in a footnote on page four of the Complaint and Jury Demand, Doc. 1, which is identical to the note found on page two of the Stipulated Scheduling Order, Doc. 20. Mr. Ragsdell therein stated that:

> RHA and [LPHF] were "joint employers" within in the meaning
> of that term as interpreted by the Tenth Circuit …Court of
> Appeals. *Bristol v. Bd. of Cnty. Comm'rs*, 312 F.3d 1213, 1218
> (10th Cir. 2002).

Doc. 1, p. 4, n. 1; Doc. 20, p. 2, n. 1.

Mr. Ragsdell never requested leave to amend the Complaint to allow him to add new theories of employer liability against LPHF.  Accordingly, because LPHF had no reason to anticipate the argument and did not conduct any discovery on the issue, it argues that allowing him to assert one now would be unduly prejudicial.  I agree.  Mr. Ragsdell may not unilaterally introduce at the summary judgment stage a new legal concept for which LPHF had no notice.

Even were I to allow the theory to be presented, it nonetheless fails to persuade.  A plaintiff who is the employee of one entity may seek to hold another entity liable by arguing that the two entities effectively constitute a single employer.  *Bristol,* 312 F.3d at 1218.  "Courts applying the single-employer test generally weigh four factors: (1) interrelations of operation; (2) common management; (3) centralized control of labor relations; and (4) common ownership and financial control. Courts generally consider the third factor—centralized control of labor relations—to be the most important." *Id.* at 1220 (citations and internal quotation marks omitted).  What courts mean by "centralized control of labor relations" is "focused almost exclusively on one question: which entity made the final decisions regarding employment matters relating to the person claiming discrimination?"  *Id.* (citations and internal quotation marks omitted).  Accordingly, the extent to which LPHF could be said to have any control over Mr. Ragsdell's hiring or firing is highly determinative.   As discussed above, LPHF had no such control.

"Of the other factors applied by the courts under the single-employer test, the fourth—common ownership and financial control—is clearly irrelevant to a case involving governmental entities" *Id.*  As the RHA is a governmental entity, the fourth factor likewise does not weigh in Mr. Ragsdell's favor.  While there is some evidence of the first factor—interrelation of operations—the independence of LPHF from the RHA under the CDFI process and the Master Agreement mitigate its weight.  Finally, though the second factor—common management—may arguably be met through the shared director role of Ms. Lopez, this second factor cannot counterbalance LPHF's utter lack of control over the hiring or firing of Mr. Ragsdell.  Taken together, I conclude from a review of the relevant factors that Mr. Ragsdell was not employed by LPHF under an integrated enterprise or single employer theory.

### B.  Mr. Ragsdell was not constructively discharged.

Mr. Ragsdell's Fourth Claim is for wrongful discharge under the doctrine of constructive discharge.  The claim fails. Constructive discharge requires the plaintiff to show an adverse employment action under working conditions "so intolerable that a reasonable person would have felt compelled to resign." *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004). In a constructive discharge claim based on disability discrimination, plaintiff must show: (1) he is a person with a disability or is regarded as having a disability[1]; (2) he was performing satisfactory work or was qualified to do the

---

[1] The ADA defines a "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 478 (1999).While individuals with MS are not

job; (3) defendant subjected him to working conditions that a reasonable person would view as intolerable because of his disability; and (4) his position remained open or was filled by someone that does not satisfy the first element. *Amro v. Boeing Co.*, 232 F.3d 790, 796 (10th Cir. 2000).   As I assess this demonstration on summary judgment, it is not necessary that Mr. Ragsdell "prove" each element, but rather that he shows that genuine issues of material fact remain, and that a reasonable jury could infer from the disputed facts that he is able to prove his claims. *See Carr v. Castle*, 337 F.3d 1221, 1229 n.9 (10th Cir. 2003) ("In the summary judgment context, of course, [the plaintiff's] burden is only that of creating reasonable inferences, not one of proof as such. But any continued repetition of that burden involves an awkward locution, an awkwardness contributed to by the fact that so much of the case law speaks of what a party responding to a Rule 56 motion must 'establish' or 'prove' or 'show.' Whenever this opinion employs such terms, it should therefore be understood as denoting [the plaintiff's] lesser burden of creating reasonable inferences, not the actual burden of persuasion.").

"When…the record does not give rise to a reasonable inference that a constructive discharge has occurred, the question is appropriately resolved by a judge as a matter of law." *Heutzenroeder v. Mesa County Valley Sch. Dist*. 51, 391 Fed.Appx. 688, 693 (10th Cir. 2010).   As with the text of *Carr*, whenever this memorandum might use the terms "establish, "prove," or "show," it should be understood as speaking to Mr. Ragsdell's burden of creating reasonable inferences, not his burden of persuasion.

---

necessarily disabled under the ADA, *see Croy v. Cobe Laboratories, Inc*., 345 F.3d 1199, 1204 (10th Cir. 2003), Mr. Ragsdell has specifically presented facts demonstrating that his MS limits the major life activity of walking.  As such, he has proved this element; Defendants Lopez and the RHA explicitly do not contest that Mr. Ragsdell is disabled under the ADA and Defendant LPHF implicitly also does not contest the fact.

Constructive discharge occurs only when an employer deliberately makes or permits "the employee's working conditions to become so intolerable that the employee has no other choice but to quit." *MacKenzie v. City and County of Denver*, 414 F.3d 1266, 1281 (10th Cir. 2005). In determining this, "the plaintiff's subjective views of the situation are irrelevant." *Emerson v. Wembley USA Inc.*, 433 F.Supp.2d 1200, 1219 (D.Colo. 2006); *see also MacKenzie*, 414 F.3d at 1281. To prove constructive discharge, a plaintiff must have sufficient facts to demonstrate the discharge under "the totality of the circumstances." *Yearous v. Niobrara County Mem'l Hosp.*, 128 F.3d 1351, 1356 (10th Cir.1997). Notably, discriminatory animus in and of itself is not necessarily enough to establish a constructive discharge claim. *Fischer v. Forestwood Co.*,Inc., 525 F.3d 972, 981 (10th Cir. 2008) (citing *Penn. State Police v. Suders*, 542 U.S. 129, 147, (2004) ("A hostile-environment constructive discharge claim entails something more [than conduct that amounts to actionable harassment.]"); *Boyer v. Cordant Technologies, Inc.*, 316 F.3d 1137, 1140 (10th Cir.2003) ("[A] finding of constructive discharge may not be based solely on a discriminatory act; there must also be aggravating factors that make staying on the job intolerable.") (internal quotation marks omitted); 1–15 *Larson on Employment Discrimination* § 15.08 (2007) ("The mere existence of discrimination will not normally constitute the kind of intolerable conditions that would make a reasonable person feel compelled to quit.").

> "The question is not whether working conditions at the facility were difficult or unpleasant." *Yearous*, 128 F.3d at 1357; *see also Lee-Crespo v. Schering-Plough Del Caribe Inc.*, 354 F.3d 34, 45 (1st Cir.2003) ("It is not enough that a plaintiff suffered the ordinary slings and arrows that workers

> routinely encounter in a hard, cold world.") (quotation
> omitted). Rather, Plaintiff must show that, at the time of his
> resignation, his employer did not allow him the opportunity to
> make a free choice regarding his employment relationship."

*Exum v. U.S. Olympic Committee*, 389 F.3d 1130, 1135 (10th Cir. 2004).

Antidiscrimination statutes do not establish a "general civility code" or make actionable

the "ordinary tribulations of the workplace." *Anderson v. Coors Brewing Co*., 181 F.3d

1171, 1178 (10th Cir. 1999).

Mr. Ragsdell argues that the totality of the circumstances left him with no choice

but to resign.  In support of his argument, Mr. Ragsdell asserts that he was subjected to

increased scrutiny when Ms. Lopez became his direct manager.  As evidence, Mr.

Ragsdell proffers his admittedly subjective interpretations of Ms. Lopez's statements to

him concerning, among other things, his use of leave time, acknowledging, however, that

at no time did Ms. Lopez yell at him, call him derogatory names, or deny him any leave.

Mr. Ragsdell repeatedly relies on his subjective perception that the instructions

from his supervisor were harassing: "Mr. Ragsdell testified that he believed Defendant

Lopez asked him to sign so that she could later accuse him of violating the rules." "Mr.

Ragsdell perceived her questions, based on her tone and demeanor, to be harassing . .

.";"Mr. Ragsdell perceived this email as harassing."; "Mr. Ragsdell perceived that it was

irrational for her to persist in inquiring about his leave balances . . ."; "Mr. Ragsdell

believed it was 'a way to put added pressure on [him] that she kn[ew he] couldn't meet.'"

Pl's Resp. ¶¶ 57, 59, 61, 63 & 65.  Though I view Mr. Ragsdell's testimony in the light

most favorable to him, there is no *objective* evidence of "intolerable" working conditions

stemming from Defendant Lopez's supposed criticism and/or scrutiny.  Mr. Ragsdell

specifically admits that his impressions of Defendant Lopez's tone as scrutinizing him are

his subjective opinions, Ragsdell Dep., Vol. I, 143:1-4, and he specifically acknowledges

that he was not subjected to threats of demotion, suspension, transfer, reassignment or

reduction in pay.  Ragsdell Dep., Vol. II, 11:18-12:19 (Mr. Ragsdell opining he had a

general hunch that Defendant Lopez, by "everything she was doing," was trying to get

him "out," but conceding there were never any direct threats of any kind).  This

subjective evidence does not pass muster.

Also insufficient is Mr. Ragsdell's contention that the written memoranda that was

slipped under his door on April 25, 2011, coupled with a second Red Flag Rules

Acknowledgment sent that evening, demonstrate that he either had to resign or would be

fired. This theory is directly belied by his own admission that while he understood is

employment to be at-will, he nevertheless believed the RHA and Defendant Lopez would

follow its handbook procedures concerning progressive discipline.  Defendant Lopez's

testimony confirms that she was following the handbook procedures and believed the

written memoranda was only the first step in the three-party disciplinary process outlined

by RHA's procedures. Mr. Ragsdell is in accord.

> Q: Did you have any understanding as to whether or not, as a
> general rule, the RHA used progressive discipline of
> employees?
> A: I did, yes.
> Q: What was that understanding?
> A: That — that that — this procedure was followed; that
> there was a written reprimand or a series of them and so forth
> up until the termination.

      ***           ***           ***

     Q: So on April 27, 2011, you were at the first stage of discipline
under the policies?
     A: Correct.

Ragsdell Dep., Vol. I, 49:13-25; 50:1-3. Thus, Mr. Ragsdell cannot claim he had a good-faith belief that his termination was imminent.  Moreover, had Mr. Ragsdell been serious enough about leaving his job or concerned enough about his job to consult the handbook, he would have learned that he had procedures available to him for reporting discrimination to the RHA board.  Similarly, Mr. Ragsdell could have but did not file a grievance with the EEOC or CCRD prior to his departure.

     Mr. Ragsdell further admits that his decision to resign was not set in stone when he arrived at work on April 27th, 2011. The evidence shows that Mr. Ragsdell arrived at work eager to speak with Ms. Lopez about her most recent missives and was "open for anything on the morning of the 27th."  Ragsdell Dep., Vol. I, 111:21-112:23.

     Q:     I'm saying it's possible.  You weren't convinced that you
were leaving—
     A:     Correct.

*Id.,* 112:21-23. He became very upset, however, when Ms. Lopez indicated she must defer meeting with him until that afternoon because she was en route to a previously made appointment.  Instead of waiting for Ms. Lopez to return, Mr. Ragsdell verbally resigned to Ms. Moore.  Because Mr. Ragsdell had other viable options besides resigning (e.g. filing a grievance with the RHA board, the EEOC, or the CCRD or simply waiting for Ms. Lopez's return to discuss with her what he perceived as harassing

correspondence), he was not constructively discharged.[2]  Therefore, I GRANT summary

judgment in favor of Defendants' on Mr. Ragsdell's Fourth Claim for wrongful discharge

under the doctrine of constructive discharge.

Indeed, I view Mr. Ragsdell's failure to explore alternatives other than resigning a

key factor in distinguishing him from the plaintiff in *Strickland v. UPS, Inc.*, 555 F.3d

1224, 1226 & 29 (10th Cir. 2009).  In *Strickland*, the Tenth Circuit found that the

plaintiff presented sufficient objective evidence that a reasonable jury could determine

that she was constructively discharged by showing, *inter alia*, that she was forced to sign

documents committing to certain sales levels that she could not attain, that she was

required to attend out of town performance review meetings during times in which she

could be selling, that she was prevented from utilizing the open door policy, that she was

held to a higher standard than her co-workers by requiring her to meet 100% of her sales

quotas, and, crucially, that she "attempted to improve her situation by filing an internal

complaint and requesting a transfer." *Id*. at 1229.

While *Strickland* is popular with the plaintiffs' bar, the Tenth Circuit regularly

upholds trial courts' grants of summary judgment in situations similar to this case.

*Trujillo v. Huerfano County Bd. of County Comm'rs*, 349 Fed.Appx. 355, 366-67 (10th

Cir. 2009)(requirement to travel long distances and two unwarranted notations in

personnel file were not sufficient to prevent summary judgment); *Keller v. Crown Cork*

*& Seal USA, Inc.*, 491 Fed.Appx. 908, 915 (10th Cir. 2012)(evidence demonstrating loud

---

[2] For substantially the same reasons as set for in Defendants' Reply Brief at p. 34-35, nothing in Mr. Ragsdell's discussion of a hostile work environment, for which he does not state a separate claim, changes this conclusion.

and heated meetings with plaintiff's supervisors, that plaintiff was directed to make up time for appointments or take vacation, that plaintiff's performance was criticized and written up for perceived problems, that plaintiff was told not to attend staff meetings, that plaintiff's friend was told not to go to her work area or talk with her, and that plaintiff's friend who supported her was terminated, was insufficient to prevent summary judgment on plaintiff's constructive discharge claim); *Heutzenroeder*, 391 Fed.Appx. at 690 (despite plaintiff being placed on administrative leave, being directed to turn in her school badge and keys, being directed to refrain from coming onto school premises except as a parent, and being contacted by the district's attorney to negotiate a settlement because the district was no longer interested in her services, plaintiff did not present sufficient evidence to prevent summary judgment on her constructive discharge claim).

i. *Mr. Ragsdell's wrongful discharge claim also fails against the RHA because of the Colorado Governmental Immunity Act.*[3]

The Colorado Governmental Immunity Act ("CGIA") states that sovereign immunity is a bar to any action against a public entity for injury which lies in tort, or could lie in tort, regardless of whether that is the type of action or the form of relief chosen by the plaintiff. C.R.S. § 24-10-106(1); *Trinity Broad. of Denver v. City of Westminster*, 848 P.2d 916, 923 (Colo. 1993). In Colorado, wrongful discharge in violation of public policy is a common law claim which sounds in tort. *See Rocky Mountain Hosp. & Med. Serv. v. Mariani*, 916 P.2d 519, 521 (Colo. 1996).

---

[3] I note that a motion under the Colorado Governmental Immunity Act is a motion to dismiss for lack of jurisdiction rather than a motion for summary judgment.  As this argument was not developed by Defendants until their summary judgment motion, however, I consider it here.

While Mr. Ragsdell asserts that his CCRD Charge satisfies the CGIA notice provisions, the Charge fails to state within which of the eight enumerated exceptions his claim falls to avoid operation of the CGIA. Per §24-10-106, any claim which sounds in tort is barred against a governmental entity, unless it falls within eight enumerated exceptions.  Although the exceptions to governmental immunity are to be broadly applied, even the most liberal reading of the enumerated exceptions cannot logically or legally encompass Mr. Ragsdell's claim for wrongful discharge in violation of public policy.  *See Craven v. University of Colorado Hosp. Auth.*, 260 F.3d 1218, 1228–29 (10th Cir. 2001).

### C.  Defendants did not violate the Rehabilitation Act.

Mr. Ragsdell's Second Claim is for violation of the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq*.).  The claim fails.  Although I have my doubts concerning Mr. Ragsdell's ability to prevail under the *McDonnell Douglas* test for purposes of his ADA and Section 1983 claims, I will assume *arguendo* that he has met it for purposes of discussing the Rehabilitation Act.  While a plaintiff may lay the groundwork for a Rehabilitation Act claim under *McDonnell Douglas*, a Rehabilation Act claim contains a further requirement that a plaintiff must prove that he has been discriminated against *solely* because of his disability.  *See* 29 U.S.C. § 794(a)(emphasis added*); Gates v. Rowland,* 39 F.3d 1439, 1445 (9th Cir. 1994)("the Act requires that the plaintiff (1) have a disability, (2) be otherwise qualified for the job, and (3) be excluded due to discrimination solely by reason of his or her disability.").

In other words, even if a discriminatory intent somehow influenced or was even the primary reason behind the various acts which are alleged to be discriminatory, such a showing would not make a successful Rehabilitation Act Claim unless the unlawful discrimination was the *sole* reason for the adverse employment action.  Mr. Ragsdell's own acknowledgment that certain alleged discriminatory actions which resulted in his alleged constructive discharge, when "taken on their own", Ragsdell Dep., Vol. I, 24:7-29:25; 57:4-7, do not constitute discrimination, necessarily defeats his assertion that a discriminatory animus was the sole reason behind the asserted constructive discharge.

### D. Mr. Ragsdell's First and Third Claims are unsuitable for summary judgment as to Defendants Lopez and the RHA.

Mr. Ragsdell's First Claim is for denial of equal protection under the Fourteenth Amendment per 42 U.S.C. § 1983 and his Third Claim is for disability discrimination in violation of the Colorado Anti-Discrimination Act, C.R.S. § 24-34-402(1) ("CADA"). There are genuine disputes of material fact that preclude summary judgment on these two claims.  By way of one (of many) examples, I am troubled by the conflicting testimony regarding whether Mr. Ragsdell received appropriate accommodation in physically moving paper files. He appears ultimately to have received assistance from Ms. Linney, but it is not at all clear why he was initially denied assistance by Ms. Lopez.

## VI.   CONCLUSION

For the foregoing reasons, regarding Doc. 34, I GRANT summary judgment in favor of Defendants Lopez and the RHA on Mr. Ragsdell's Second (Rehabilitation Act) and Fourth (wrongful discharge-constructive discharge) claims and DENY summary

27

judgment for the same on Mr. Ragsdell's First (Equal Protection) and Third (CADA) claims. I GRANT LPHF's Motion for Summary Judgment, Doc. 35, in full. Furthermore, I hold that the record is not clear enough to rule on Defendant Lopez's qualified immunity issue.  The record does not permit me to determine whether she in fact did violate Mr. Ragsdell's rights.  Without knowing what rights she violated, I cannot say whether she was on notice that her acts would violate his rights (again, if in fact they were violated.) I do not address whether the constructive discharge claim is also barred because the CADA provides a statutory remedy for discrimination because such an analysis is unnecessary to this disposition. Personally, I agree with Judge Daniel that a wrongful discharge claim can be brought in tandem with a CADA claim.  *Kennedy v. Colo. RS, LLC*, 872 F. Supp. 2d 1146, 1149 (D. Colo. 2012).


DATED:              March 12, 2014              BY THE COURT:

                                               **<u>s/John L. Kane</u>**
                                               John L. Kane, U.S. Senior District Judge